UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| TANMAYA KABRA, a/k/a TAN KABRA, and ) | JURY TRIAL DEMANDED |
| LAUNCHBYTE.IO, LLC a/k/a ) | |
| THE KABRA GROUP, LLC ) | |
| ) | |
| Defendants, ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against defendants Tanmaya Kabra ("Kabra") and LaunchByte.io, LLC (also known as The Kabra Group, LLC) (collectively, "Defendants"):

## PRELIMINARY STATEMENT

1.     Beginning no later than June 2018 and continuing through at least June 2019, Kabra, individually and through his limited liability company LaunchByte.io, LLC (also known as The Kabra Group, LLC), deceived investors into giving him money with false promises of double-digit returns in a matter of months with no risk.   Kabra's stories and promises were lies. Upon receipt, Kabra used investor money to, among other things, buy himself a boat, pay credit card balances, and make Ponzi-like payments to earlier investors.

2.     Kabra's stories varied investor-to-investor.  The "investment" opportunities he presented were mostly based on the idea that Kabra had acquired ownership interests in one or more startup companies through his limited liability companies, and that he needed a short-term

infusion of cash from investor(s) to facilitate the purported sale or sales of those companies.  In each case, Kabra promised a very high return on investment (up to 32%), quickly, and with no risk.

3.       Kabra's actual use of investor funds reveals that Kabra's "investment" opportunities were fabrications.  In one instance, over the July 4, 2018 holiday week, Kabra signed a purchase agreement for a boat, deposited an investor's funds into Kabra's personal bank account, and used funds from the investor to buy the boat, all without the knowledge or permission of the investor, and contrary to what he told the investor his money would be used for.  In another instance, Kabra told an investor that his funds would be repaid "tomorrow," then paid the investor back with a new investor's money the day after the new money came in.  In another outright lie, Kabra told an investor that a startup company was about to be acquired, but that startup company was never even in talks to be acquired.   Kabra made a payment to that investor on June 12, 2019, from what appear to be recently raised new investor funds.

4.       By engaging in the conduct alleged herein, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 (the "Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder.

5.       Based on these violations, the Commission seeks emergency preliminary relief, including a temporary restraining order and subsequent preliminary injunction:  (a) prohibiting Defendants from continuing to violate the Securities Act and the Exchange Act; (b) freezing Defendants' assets; (c) requiring Defendants to provide an accounting of client assets; (d) prohibiting Defendants from soliciting, accepting, or depositing any monies obtained from actual or prospective investors pending the resolution of this action; (e) restraining Defendants from

destroying, concealing, or disposing of property or documents related to the conduct alleged in this Complaint; (f) requiring Defendants to repatriate assets; and (g) authorizing the Commission to commence discovery immediately.

6.      The Commission also seeks:  (a) a permanent injunction prohibiting Defendants from further violations of the Securities Act and the Exchange Act; (b) disgorgement of Defendants' ill-gotten gains, plus prejudgment interest; (c) civil penalties due to the egregious nature of Defendants' violations, and (d) such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)].

8.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

9.      Venue lies in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa], because a substantial part of the acts constituting the alleged violations occurred in Massachusetts and Defendant Kabra resides in Massachusetts and transacts business here.  Also, Defendant LaunchByte.io, LLC and its successor entity The Kabra Group, LLC, were organized and transacted business in Massachusetts.

10.     In connection with the conduct alleged in this Complaint, Defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

11.     Defendants' conduct involved fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

12.     **Tanmaya Kabra**, 25, resides in Boston, Massachusetts.  Kabra conducted his business individually and through several limited liability companies including LaunchByte.io, LLC (also known as The Kabra Group, LLC).  Kabra maintained and was the sole signatory on several bank accounts in his own name and bank accounts in the names of the limited liability companies through which he did business, including LaunchByte.io, LLC and The Kabra Group, LLC.

13.     **LaunchByte.io, LLC (also known as The Kabra Group, LLC)** was a limited liability company organized in Massachusetts in April 2015 until it was dissolved involuntarily in approximately June 28, 2019.  Kabra was its manager and resident agent.  LaunchByte.io, LLC was named Climax Entertainment Group, LLC until March 2016, when its name changed to LaunchByte.io, LLC.  In January 2018, its name changed again to The Kabra Group, LLC. Kabra maintained and had sole signatory authority over LaunchByte.io, LLC's and The Kabra Group, LLC's bank accounts.

## FACTS

14.     Beginning no later than June of 2018, Kabra held himself out as the Founder and Managing Director of LaunchByte.io, LLC, which he described online as a "unique startup hub

4

and investment boutique (check sizes $100K-$300K) with a strong focus on product design, development and marketing." The company purported to function as an incubator for startups, offering a suite of various marketing and app development services intended to make the startups more marketable.

15.     Kabra used his supposed relationships with startups, including the ownership interests he claimed to have acquired through his work with LaunchByte, to defraud at least four investors, beginning in at least June 2018 and continuing through at least June 2019, with stories about using their money to launch start-ups or sell a portfolio of startups.

16.     Kabra currently holds himself out as the Managing Director of Vanguard Ventures Group, which purports to work with "high-powered firms to execute complex models in alternative investment sectors" and to be "focused on projects ranging from $250M-$2B in size." Kabra opened a new "LaunchByte Ventures LLC" bank account in approximately April, 2019 and at least $450,000 – some with wire memos noting "services," or "services promissory note investment" – has been sent to that account since then. Also, at least one LaunchByte investor has been repaid $120,000 with funds from that account.

## I.     Kabra's Proposed "Debt Deal" Ensnares Two Investors and Kabra Immediately Misappropriates Their Money.

17.     In December 2017, Kabra met Investor A. Kabra presented himself as a high net worth individual who knew of various investment opportunities or – as he described them to Investor A, "cool deals." On or about June 20, 2018, Kabra solicited Investor A by text message to "go in with [Kabra] on a bigger deal." Kabra told Investor A that he could earn a 30% return on an investment of $175,000 in just four months if he invested with Kabra, describing the offer in text messages as "175 @ 30 points – In 120 days." Investor A asked about what the risks

were and Kabra texted that there were "None remember – tokenized collate[ral] – And [I']m backing you on it."

18.    Kabra told Investor A that if they could invest a "total round" of $500,000, they could get an even higher – 32% – interest rate.   Kabra assured Investor A that Kabra himself was investing $125,000 to $150,000 of his own money.  As Kabra put it to Investor A, "I'm doing 125 now… Or maybe I'll do 150."  Investor A expressed interest but said he might "need a few weeks" to be prepared to participate.  Kabra made a show of dealing with a third party in connection with the purported deal, asking "How long do you need?" and promising to try to "buy that time" from the third party so Investor A could participate.  In a later text, Kabra perpetuated the illusion of a real deal with a third party, writing, "[c]all was great [thumbs-up emoji] really solid," then continued, "[a]nd tokenized collateral.  So secure [thumbs-up emoji]." In reality, there was no third party and no deal.

19.    On or about June 25, 2018, Investor A committed to making an investment and wrote in a text message, "[l]et me see what the max I can do is."  Investor A speculated "Def 100. Prob 150. Maybe 200" – in other words, he could invest between $100,000 and $200,000 with Kabra.  Kabra urged, "Try for 200 so we can keep between us."

20.    Promising similar terms, Kabra also solicited funds from Investor B, a friend of Investor A's.  In text messages, Kabra claimed that, of $500,000 supposedly needed for the investment, Kabra himself had committed $150,000 and Investor A had committed $200,000. Kabra also claimed to Investor B that Investor B could earn "32 pts [interest] Timeframe: 120 days."  Kabra also texted Investor B, "My fund will back it/act as guarantor as well!"

21.    Kabra discussed the terms of the deal with Investors A and B via text message and in at least one phone conversation with Investor B.  Kabra did not provide Investor A or B

with any substantive written description of the deal.  Instead, he explained either that funds were

needed to facilitate the sale of LaunchByte's "portfolio" of startup companies or the sale of a

startup in which LaunchByte had an equity ownership interest. In reality, neither story was true.

22.     On or about July 2, 2018, Investor A texted Kabra that Investor B would probably

invest $150,000 in the supposed deal.  Investor A himself committed to investing $200,000, later

noting that he could contribute more if Investor B couldn't free up sufficient funds. (Investor A

later agreed to invest $250,000.)

23.     On or about July 2, 2018, LaunchByte.io, LLC issued a promissory note to

Investor B in which the company agreed to repay Investor B $150,000 along with 32 percent

interest in four months "from the first day (kickoff) of the project."  Kabra signed the promissory

note on behalf of LaunchByte.io, LLC as the "Investee."  Investor B signed the promissory note

as the "Investor."  (Investor B ultimately invested $100,000, not $150,000.)

24.     On July 3, 2018, the day after signing the $150,000 promissory note with Investor

B and getting Investor A's commitment to invest $200,000, Kabra signed a purchase agreement

to buy a $255,978 2018 295Pursuit boat from a boat dealer in Peabody, Massachusetts.  Since

late spring of that year, Kabra had been talking to the boat dealer about buying a motorboat of

some type.  Kabra had sought and been refused commercial financing, then claimed that a friend

might provide financing, but been unable to find a way to pay for a boat.  Once Investors A and

B committed to provide their money for the so-called "investment," however, Kabra entered into

a deal to buy the 295Pursuit boat.

25.     Kabra indicated that he expected Investor B to wire the money for his

"investment" and offered to "take care of any same day fees" for the wire.  Bank records reveal

that, from about July 5 through about July 9, 2018, Investor B wired a total of $100,000 for the investment to the LaunchByte.io, LLC bank account.

26.     On or about July 6, 2018, Investor A provided Kabra with a cashier's check for $250,000, made out to Kabra. In order to get the money, Investor A sold mutual funds in late June 2018. Kabra deposited the check into his personal bank account (which had a $0 balance) the same day.

27.     Over the next two days, Investor A and Kabra, representing "investee" LaunchByte.io, LLC, memorialized the investment in a promissory note. In the note, dated July 7, 2018, the company promised to repay Investor A's principal with 32% interest four months after "kickoff" of "the project." The note described Investor A's investment as being "for the purpose of financing the startup."

28.     Contrary to what Kabra had told Investor A, there was no "tokenized collateral." There was no "so secure" investment. Kabra did not invest Investor A's money to "finance a start-up." Instead, he used it to buy himself a boat. On July 9, 2018, Kabra wired $201,500 of Investor A's money from Kabra's personal bank account to the boat dealer in partial payment for Kabra's new boat.

29.     As with Investor A's money, Investor B's money also was diverted from what Kabra had represented to Investor B. Kabra did not use Investor B's money to facilitate the sale of one or more of LaunchByte's purported startup companies. Instead, Kabra used most of Investor B's money to pay existing credit card debt.

30.     Specifically, on July 5, after receiving an influx of $30,000 of Investor B's money in the LaunchByte.io, LLC bank account, Kabra transferred $18,585.85 to American Express and

$14,454.73 to Chase Bank to pay existing credit card debts.  The Chase payment was returned the next day due to insufficient funds in the LaunchByte.io, LLC bank account.

31.     On July 9, after receiving $50,000 more of Investor B's money in the LaunchByte.io, LLC bank account, Kabra transferred $53,200 to the LaunchByte, LLC bank account, and, from there, transferred $53,974.39 to American Express to pay existing credit card debts.

## II.     Kabra Meets Investor C and Solicits His $75,000 Investment in LaunchByte.

32.     In July 2018, Kabra met Investor C at a social event celebrating the Fourth of July.  The two met later that month for drinks, and Kabra represented to Investor C that LaunchByte's business involved working with start-up companies until they were in a position to be sold, resulting in a profit to LaunchByte's investors.  Kabra represented that one of the LaunchByte start-ups was about to be acquired by a larger company, and thus convinced Investor C to invest $75,000 in LaunchByte.  Kabra promised Investor C that he would pay LaunchByte's debt under the note personally if LaunchByte did not pay.  As part of his efforts to get Investor C to give him $75,000, Kabra provided Investor C with a "personal financial statement" bearing the name of a local bank.   On the form, Kabra had listed assets totaling over $19 million, including over $16 million in ownership interests in businesses.

33.     Investor C agreed to invest $75,000 in LaunchByte.  Investor C understood that his investment would be used to finance the impending launch of the start-up company that was supposedly about to be acquired.  On or about August 1, 2018, LaunchByte.io, LLC issued a promissory note to Investor C.  According to the terms of the note, Investor C would invest $75,000 "for the purpose of financing the startup."  The note guaranteed repayment in six months with 18% interest, for a total of $88,500, with additional interest accruing at 20% per

year if payment was delayed.   Kabra signed the promissory note on behalf of LaunchByte.io,

LLC as "Investee," and also signed in his individual capacity as guarantor.   Investor C signed the

promissory note as the "Investor."   Along with the promissory note, Kabra executed an unlimited

guaranty promising to pay LaunchByte.io, LLC's debts to Investor C.

34.      On or about August 3, 2018, the day the promissory note was signed, Investor C

wired $75,000 to the LaunchByte.io, LLC bank account.   The wire memo stated "purpose

investment."   According to the terms of the promissory note, repayment was due in or about

early February 2019 (six months from the date of the August 2018 agreement).

35.      Kabra's story about needing money to facilitate the impending acquisition of a

startup company was a lie.   There was no impending acquisition.   The co-founder of the startup

company has never heard of Investor C, and the startup company never received any funds from

Investor C.

### III.      Investor B Looks to Be Repaid; Kabra Repeatedly Lulls Him, then Pays Him with Another Investor's Money.

36.      When he induced Investor B to invest with him, Kabra represented that he would

pay the full amount due under the promissory note along with 32 percent interest in four months,

starting at the end of the second month.   When more than two months passed without any

payment, Investor B began asking Kabra to repay him.   Kabra repeatedly lied to Investor B and

engaged in various deceptive acts aimed at preventing Investor B from detecting Kabra's fraud.

37.      For example, on or about September 30, 2018, Investor B sent a text message to

Kabra asking when Kabra would start paying returns.   On or about October 10, 2018, Kabra met

with Investor B and gave him a check in partial satisfaction of the promissory note.   Investor B

deposited the check on October 12, but it bounced.   In an attempt to conceal the fact that the

account did not have sufficient funds to cover the check to Investor B, Kabra texted Investor B

on October 15 claiming that the money might not be available because of government "verification" of his "new fund." Kabra wrote, "we received a notice today from SEC & IRS saying our main accounts are undergoing verification which is standard for a new fund. They said any checks, ACHs, and wire transfers will be blocked during this time." This was not true, as Kabra knew. The LaunchByte.io, LLC account was not undergoing any verification by the SEC, and no evidence supports the claim that the IRS was engaged in verification either.

38.     On October 16, Kabra sent Investor B a text message saying, "[w]e received half of the payout on the debt fund now just waiting on the other half." He also sent a text message containing an image of an email wire transfer notice from the bank stating that $1.35 million had been wired to the LaunchByte.io, LLC account on October 10, 2018. Bank records reflect no such transfer. As Kabra knew, that account had not received $1.35 million on October 10.

39.     Finally, under continued pressure to repay Investor B, Kabra solicited money from another investor (Investor D) and used it to repay Investor B.

40.     Investor D was someone that Kabra knew socially. In or around December 2018, Kabra approached Investor D about investing in LaunchByte for a one-year term. According to Kabra, LaunchByte was taking on $1 million worth of debt in order for it to be purchased by KV Ventures, a nascent fund that Kabra was attempting to launch. Kabra told Investor D that LaunchByte would be able to repay him in seven to twelve months. Kabra induced Investor D to provide the money by, among other things, implying that he co-owned property worth $1.5 million that could be used as collateral.

41.     On or about December 6, 2018, Kabra sent Investor D an email describing the terms of the proposed investment. In the email, Kabra claimed that LaunchByte owned twenty investments worth over $2.5 million and would be selling the investments to a new fund. Kabra

wrote that the new fund had completed a "first close" of $7 million, and that "cash will be coming into the fund within the next few weeks (documents are being signed right now by the investors and wires are coming in)." Kabra further claimed that LaunchByte needed to fund expenses associated with completing the second phase of the supposed sale. In connection with that "second close," Kabra represented, LaunchByte was taking on $1 million in debt, which would "carry 20% interest" and have a one-year term. Further inducing Investor D, Kabra claimed that it would "most likely . . . only be a 7 month term, but we would like to keep a buffer of an extra few months just in case." In addition to promising 20% interest for a likely seven-month investment, Kabra assured Investor D that the note was "secured by a guaranty from KV Ventures I, LP."

42.     After sending this email, Kabra sent Investor D a draft promissory note further describing that the deal was "for the purpose of financing the acquisition of the portfolio." The draft promissory note provided that LaunchByte.io, LLC, as "investee," would repay Investor D, the "investor," his $250,000 investment, along with interest at the rate of "20% simple interest." The principal and interest were calculated in the draft note at $300,000.

43.     Kabra's real plans for Investor D's funds had little, if anything, to do with KV Ventures or any "acquisition." During this same time period, Kabra was lulling Investor B with promises that he was in the process of repaying Investor B's investment. On December 6, Kabra wrote to Investor B that a wire transfer repaying some portion of his investment was "already done." In the morning of December 10, Investor B followed up by text, asking Kabra to confirm that the wire was "coming today," which Kabra confirmed it was. Later that afternoon, however, Kabra sent a follow-up message, claiming that he had "mistyped" Investor B's last name and had to re-send the supposed wire. He claimed it would take "3 biz days" for the ACH transfer to get

to Investor B's account and gave Investor B his "word" that Investor B would get a $50,000 repayment on "Wednesday" (December 12).   When that transfer did not come through as promised, Kabra wrote Investor B a check and encouraged Investor B to "put the check in" to Investor B's account so that he could "have the whole 88 instead of just 50."   In other words, Kabra promised Investor B $88,000, rather than just the previously-promised $50,000.   Investor B deposited the check that day, but it did not clear because the LaunchByte.io, LLC bank account had insufficient funds.   Investor B continued to follow up with Kabra on December 14, and 16, asking for the money.   Kabra claimed to have initiated a new wire transfer that would clear on December 17.

44.   On or about December 17, 2018, Investor D gave Kabra a cashier's check for $250,000 made out to LaunchByte.io, LLC.   Kabra deposited the check in the LaunchByte.io, LLC bank account the same day.   Investor D's funds brought the account balance to $271,434.49.

45.   The next day, after Kabra deposited Investor D's money in the LaunchByte.io, LLC account, Investor B wrote at 10 a.m. that he "got $80k wire."   Kabra used Investor D's money to fulfill his promises to repay Investor B.   Investor D was not told that his money would be used to repay an earlier investor and did not authorize his investment to be spent this way.

## IV.   Kabra Continues to Fundraise and Makes Another Ponzi-like Payment, This Time to Investor C.

46.   Investor C's "guaranteed" repayment of $88,500 was due in early February 2019 under the terms of the promissory note that he had signed in August 2018.   As of late May 2019, Kabra had not paid Investor C.   When Investor C asked to be repaid, Kabra offered many excuses for his inability to repay him, but never disclosed that the supposed impending acquisition of the startup company had not happened (because the story itself was a lie).   Instead,

13

Kabra claimed that LaunchByte was being acquired and that Investor C would be repaid after the transaction. Investor C continued to pursue repayment from Kabra, including by sending him repeated text messages asking for his money.

47.     Beginning no later than January 2019, Kabra also began holding himself out as the "Managing Director" of a new entity called Vanguard Venture Group. Kabra described Vanguard Venture Group online as "focused on projects ranging from $250M-$2B in size" and as working with "high-powered firms to execute complex models in alternative investment sectors." On April 10, 2019, he opened a new bank account at Santander Bank, in the name of "LaunchByte Ventures, LLC."

48.     Eventually, to prevent Investor C from uncovering his scheme, Kabra made a Ponzi-like payment to Investor C. On June 10, 2019, two different people wired $133,000 each to a LaunchByte Ventures, LLC bank account over which Kabra had sole signatory authority. The wire memos read "services promissory note investment," and "services," respectively. These transfers brought the account balance in the LaunchByte Ventures, LLC account to $273,921.61 (from a prior balance of $7,921.61). Two days later, Kabra wired $120,000 from this account to Investor C.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
#### (Violations of Section 17(a) of the Securities Act)

49.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-48, above.

50.     By reason of the foregoing, Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) have

employed or are employing devices, schemes, or artifices to defraud; (b) to obtain money or property by making untrue statements of material fact or omitting to state material fact(s) necessary to make the statements made not misleading or (c) have engaged or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities..

51.     By reason of the conduct described above, Defendants have violated, and unless enjoined will continue to violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

<strong><u>SECOND CLAIM FOR RELIEF</u></strong><br/><strong>FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES</strong><br/><strong>(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)</strong>

52.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-48, above.

53.     By reason of the foregoing, Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail:  (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material fact(s) necessary to make the statements made not misleading; or (c) have engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

54.     By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a temporary restraining order prohibiting further violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; an order freezing all Defendants' assets held for their direct, or indirect benefit, and/or subject to their direct or indirect control; an order requiring an accounting of the assets and liabilities of the Defendants, including all monies directly and indirectly received from investors and all uses of investor funds; an order prohibiting the Defendants from continuing to accept or deposit additional investor funds; a repatriation order for all assets held for the Defendants' direct or indirect benefit, and/or subject to the Defendants' direct or indirect control located outside the United States; an order to deposit all investor-derived cash with the Court whether originally held inside or outside the United States; expedited discovery; and an order prohibiting the alteration or destruction of relevant documents; and, upon further motion, enter a preliminary injunction for the same relief, including all relief requested above;

B.     Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

C.      Require Defendants to disgorge their ill-gotten gains, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

D.      Require Defendants to pay appropriate civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

//s//  Martin F. Healey
Rachel Hershfang  (Mass. Bar No. 631898)
    Senior Trial Counsel
Emily Holness  (New York Bar No. 4947941)
    Senior Enforcement Counsel
Alicia Reed (New York Bar No. 4913596)
    Senior Enforcement Counsel
Amy Gwiazda (Mass. Bar No. 663494)
    Assistant Regional Director
Martin F. Healey  (Mass. Bar. No. 227550)
    Regional Trial Counsel

Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8987  (Hershfang direct)
(617) 573-4590  (fax)
HershfangR@sec.gov (Hershfang email)

Dated: August 5, 2019