United States District Court
District of Massachusetts

```
_____
                            )
SECURITIES AND EXCHANGE COMMISSION,)
                            )
     Plaintiff,             )
                            )
          v.                )    Civil Action No.
                            )    19-11676-NMG
TANMAYA KABRA, a/k/a TAN KABRA and )
LAUNCHBYTE.IO, LLC, a/k/a   )
THE KABRA GROUP, LLC,       )
                            )
     Defendants.            )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

The United States Securities and Exchange Commission ("the SEC") brings this civil action against Tanmaya Kabra ("Kabra") and his company, LaunchByte.io, LLC, aka The Kabra Group, LLC ("LaunchByte") (collectively "defendants") for violating Section 17(a) of the Securities Act of 1933 ("the Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 promulgated thereunder.

Pending before the Court is a motion of defendants to dismiss the complaint on the ground that the promissory notes sold do not qualify as "securities" under the Securities and Exchange Acts.

## I. **Background**

Over a course of more than one year, Kabra, on behalf of LaunchByte, solicited funds from various so-called "investors" with the promise of double-digit interest returns at minimal risk.[1] The SEC alleges that Kabra operated under the guise of organizing startups through LaunchByte, which was described on its website as a "unique startup hub and investment boutique." Kabra made claims that LaunchByte acquired ownership interests in one or more startup companies and needed short-term cash infusions of between $100,000 to $300,000 to facilitate sales. Kabra advertised up to 32% investment returns within a short period of time with little to no risk.

The SEC further alleges that, instead of using that investment money for business purposes, Kabra diverted funds for his personal use, including to buy a boat, pay credit card debt and provide returns to other investors in a Ponzi-like scheme. Ultimately, Kabra solicited seven investors and received substantial funds from six as follows:

**Investor A:** In June, 2018, Kabra solicited "Investor A" for $175,000 under the promise of a 30% return in four months. Kabra promised a no risk investment due to "tokenized

---

[1] To maintain consistency with the filings of both parties, the Court will refer to the individuals from whom defendants solicited funds as "investors" but in so doing, draws no dispositive legal conclusion.

collate[ral]" and his personal "backing". Investor A committed $250,000 at an interest rate of 32% due four months "from the first day of the (kickoff) of the project". The agreement was memorialized by a promissory note that described the funds as being "for the purpose of financing the startup."

**Investor B**: At about the same time, Kabra solicited funds from "Investor B". Investor B agreed to provide $150,000 at an interest rate of 32% due four months "from the first day of the (kickoff) of the project". The promissory note drawn in consideration also stated the funds were "for the purpose of financing the startup."

**Investor C**: In August, 2018, Kabra solicited $75,000 from "Investor C" allegedly to provide cash flow until one or more of LaunchByte's startups was acquired. The corresponding note guaranteed repayment in six months at an 18% interest rate with an additional 20% interest per year if payment were delayed. Kabra promised to pay the debt personally if LaunchByte did not pay.

**Investor D**: In December, 2018, Kabra approached "Investor D" for funds. Investor D anted up $250,000 at an interest rate of 20%. The corresponding note referred to LaunchByte as "investee" and Investor D as "investor".

**Investors E & F:** In June, 2019, Kabra solicited approximately $130,000 each from "Investors E and F". The transfer memos of those investors read, "service promissory note investment."

**Investor G:** Kabra solicited funds from "Investor G" in August, 2019, but the transfer of funds was not consummated because Kabra was arrested on August 4, 2019.

At various times during the alleged scheme, certain early investors sought repayment of their investments. According to the SEC, Kabra met those requests with either excuses or partial payment from funds solicited from new investors. For example, in September, 2018, Investor B sought satisfaction of his note. Kabra drew him a check for one-half of the amount owed. When the check bounced, Kabra explained that the funds were unavailable because of government "verification" of his "new fund" and that he received a "notice from the SEC & IRS saying [the] accounts [were] undergoing verification" and, for that reason, any attempt to withdraw funds was temporarily blocked. Shortly thereafter, Kabra received funds from Investor D and promptly wired partial payment to Investor B. Similarly, Kabra allegedly used funds from Investors E and F to repay Investor C.

Shortly after Kabra was arrested, the SEC filed the instant action against him and his company and moved for a temporary

restraining order ("TRO") and preliminary injunction 1) to restrain defendants from committing further acts of securities fraud, 2) to freeze any remaining investor assets in the defendants' bank accounts, 3) to freeze the defendants' assets, 4) to have defendants account for ill-gotten gains, 5) to require defendants to identify other victims, 6) for the issuance of a repatriation order for all assets held for defendants' direct or indirect benefit and/or control, and 7) to prohibit the destruction of documents and allow for expedited discovery.

This Court entered the requested TRO on August 6, 2019, and scheduled a prompt hearing on the motion for a preliminary injunction. The parties jointly moved for, and the Court allowed, a postponement of the hearing and an extension of the TRO while defendants retained counsel. After retaining counsel, defendant moved to dismiss. The Court then allowed the parties' joint request to postpone the preliminary injunction hearing and extend the TRO until after a ruling on the motion to dismiss.

## II. **Motion to Dismiss**

### A. **Legal Standard**

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007). In considering the merits of a motion to dismiss, the Court may only look to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. Nollet v. Justices of Trial Court of Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000), aff'd, 228 F.3d 1127 (1st Cir. 2000).

Furthermore, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000). If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. See Nollet, 83 F. Supp. 2d at 208.

Although a court must accept as true all the factual allegations in a complaint, that doctrine is not applicable to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662 (2009). Threadbare recitals of legal elements which are supported by mere conclusory statements do not suffice to state a cause of action. Id. Accordingly, a complaint does not state a claim of relief where the well-pled facts fail to warrant an inference of any more than the mere possibility of misconduct. Id. at 1950.

**B. <u>Application</u>**

The SEC claims that Kabra engaged in misstatement liability under Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 and scheme liability under Section 17(a)(1) and (a)(3) of the Securities Act and Rule 10b-5(a) and (c).

To prevail on its claim for misstatement liability under Section 17(a)(2) of Securities Act, the SEC must prove that Kabra directly or indirectly obtained money or property by means of any untrue statement of material fact or omission of material fact in the offer or sale of any security. Under Section 10(b) of the Exchange Act and Rule 10b-5, the SEC must prove that Kabra knowingly made materially false and misleading statements in connection with the sale of securities. Section 17(a)(2) requires only proof of negligence whereas Section 10(b) and Rule 10b-5 require proof of scienter as well.

To prevail on its claim for scheme liability under Sections 17(a)(1) and (a)(3) of the Securities Act and Rule 10b-5(a) and (c), the SEC must demonstrate that Kabra employed a device, scheme or artifice to defraud or engaged in any transaction practice or course of business which operates as a fraud or deceit upon the purchaser in the offer or sale of securities.

Proof of scienter is required for each provision except Section 17(a)(3).

Defendants' sole argument in support of dismissal is that the notes signed by the various investors are not "securities" as contemplated by the Securities and Exchange Acts and, therefore, the complaint fails to state a plausible claim for relief.

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include "any note." The United States Supreme Court has held that there is a rebuttable presumption that every promissory note is a security. Reves v. Ernst & Young, 494 U.S. 56, 65 (1990). That presumption can be rebutted only by demonstrating either that the note is on a list of certain excepted items or that the note bears a "strong resemblance" to an item on that list. Id. at 67. The list includes:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized) . . . [and] notes evidencing loans by commercial banks for current operations.

Id. at 65 (quoting Exchange Nat'l Bank of Chi. v. Touche Ross & Co., 544 F.2d 1126, 1138 (2d Cir. 1976)).

The Reves decision sets forth a four-factor test for determining whether a note bears a strong resemblance to an item on that list or, in the alternative, whether a new category of notes should be added to the list. Id. at 65-67.  Under Reves, a court must consider: 1) the intentions of the parties, 2) the plan of distribution, 3) the reasonable expectations of the investing public and 4) the existence of risk-reducing factors. Id.  Failure to satisfy any one factor is not dispositive. See, e.g., McNabb v. SEC, 298 F.3d 1126, 1132-33 (9th Cir. 2002).

### 1. Intentions and Motivations of the Parties

The first Reves factor focuses on the purpose of the seller and the primary interest of the buyer.  If the purpose of a seller is to raise funds for the use of a business enterprise or to finance substantial investments and the interest of the buyer is primarily the expected profit generated by the note, the instrument likely qualifies as a security. Reves, 494 U.S. at 65-67.  Conversely, if a note is exchanged to facilitate the purchase and sale of a "minor asset or consumer good" in an effort to remedy the seller's cash-flow difficulties or to advance "some other commercial or consumer purchase" then the note is less likely to qualify as a security.  Id. at 66-67.

There is a dearth of case law in this Circuit addressing the Reves test. The Sixth Circuit, however, considered the Reves test in similar circumstances in Bass v. Janney Montgomery Scott, Inc., 210 F.3d 577, 585-86 (6th Cir. 2000). In that case, an investor provided various short-term bridge loans to a company as interim funding until a private offering commenced. Id. at 582. The court held that the first factor of the Reves test was a "wash" because from the company side, the motivation was akin to a commercial loan transaction (unlike a security) but from the investor side, the motivation looked more like a security transaction for profit. Id. at 585.

Approaching the inquiry first from the buyer's perspective, defendants argue that the expectation on the part of the buyers of profit in the form of interest likens the transaction to a commercial loan. As the SEC emphasizes, however, the investors here are individuals, not commercial banks, and were primarily interested in the obtaining a "valuable return on their investment" in the form of interest. Reves, 494 U.S. at 68 n.4.

On the seller side, the SEC contends that a security was created because Kabra's primary purpose was to raise money for use in his business enterprise as a "unique startup hub and investment boutique". Defendants respond that the promissory

notes are akin to commercial loans needed to raise interim funds to correct cash-flow shortfalls, much like a "bridge loan".

Although this case appears to be, at least facially, analogous to Bass, there is one meaningful difference stemming from the fraud alleged by the SEC. Kabra allegedly appropriated funds provided by investors to cover his own personal expenses and to pay back other investors. Such allegations, taken as true at the motion to dismiss stage, weigh heavily against defendants' assertion that Kabra's motivation in soliciting investments was limited to a need for short-term cash infusions.

Accordingly, this factor weighs in favor of classifying the promissory notes as securities.

### 2. Plan of Distribution

The plan-of-distribution factor turns on whether there is common trading of the notes for speculation or investment. Reves, 494 U.S. at 66-67. If the answer is yes, a note is perceived to be a security. Id. Defendants emphasize this factor as "perhaps the most essential" and explain that the limited number of notes that were executed were negotiated one-on-one with individual investors. The SEC underscores the fact that defendants sold the notes to individuals rather than to corporate entities. Accordingly, those individuals would

benefit from the protection of the securities laws, rendering this factor a wash. See McNabb, 298 F.3d at 1132.

The limited number of individuals to whom the notes were sold and the fact that they were negotiated separately weighs against classifying the notes as securities. For example, in Bass, the Court found that the second factor weighed against classifying the notes as securities because the transaction was unique and negotiated with a single individual. Bass, 210 F.3d at 585. Although defendants emphasize that the notes here, just as in Bass, were never intended to be offered to the "public," that fact is not dispositive. Bass stands only for the proposition that a single offering may be insufficient to satisfy the second Reves factor. Id. No court has found that seven transactions, particularly when offered to individuals rather than business entities, can be considered unique (rather than broadly distributed) offerings.

Accordingly, the Court agrees with the SEC that this factor is inconclusive.

### 3. Reasonable Expectations of the Investing Public

The third Reves factor depends upon the "reasonable expectations of the investing public" and examines whether a member of the public, if offered the opportunity to purchase the note would expect the protection of federal securities laws.

Reves, 494 U.S. at 66-67. To assess this factor, courts look to whether there is a valuable return on the investment, the length and characteristics of the note and the manner in which the note is described to purchasers. See id.; see also Stoiber v. SEC, 161 F.3d 745, 751 (D.C. Cir. 1998).

In Reves, the Court held that a reasonable buyer of the notes at issue would have believed that he was purchasing a security because the notes were advertised as "investments" and there were no countervailing factors that would have led a reasonable person to question that designation. Reves, 494 U.S. at 69.

Defendants submit that this factor weighs in their favor because the notes here were not sold to raise money to support general business operations but rather were intended to finance particular transactions. It would be unreasonable, according to defendants, for an individual to believe a "particularly-negotiated and privately-offered" note executed in connection with a bridge loan directed to fund a specific transaction was a security.

Defendants overlook, however, Kabra's numerous statements and assurances to buyers that the notes would be used for the purpose of acquiring and financing portfolio companies, a sure indication that the funds were being invested. Several notes

even described the buyer as the "investor" and LaunchByte as the "investee", though others referred to the parties as "borrower" and "lender". To one investor, Kabra even claimed that the SEC "verification process" had delayed his ability to repay the note. Other investors memorialized their understanding of the transaction as an "investment" in the memo lines of their wire transfers.

The SEC further alleges that Kabra touted himself publicly as being in the investment business, operating an investment boutique and specializing in start-ups akin to an "early stage venture capital firm".

With respect to the duration of the note, Section 3(a)(10) of the Exchange Act expressly excludes from the definition of a security any note "which has a maturity time of issuance not exceeding nine months." The SEC correctly observes, however, that it has interpreted the exclusion to apply only to commercial paper as opposed to investment securities. See Release No. 33-4412, 26 FR 9158 (1961); see also Zeller v. Bogue Elec. Mfg. Corp., 476 F.2d 795 (2d Cir. 1973).

The language Kabra used in soliciting buyers and advertising his services demonstrates that a member of the investing public would reasonably expect in this case that he or she was purchasing a security with the full protection of the

securities law.  Consequently, this factor weighs in favor of
classifying the notes as securities.

### 4. The Existence of Risk-Reducing Factors

The final Reves factor is whether there exists any risk-reducing factors, such as an alternative regulatory scheme or guarantee.  Reves, 494 U.S. at 69.  Defendants point to Kabra's messages to various investors assuring them he would personally guarantee the notes.  As further evidence of risk-mitigation, defendants emphasize that in connection with several notes, Kabra executed unlimited personal guarantees and indemnified the noteholders for attorneys' fees and costs.

Kabra's unsubstantiated and allegedly false promises are insufficient risk-mitigation tools. See Pollack v. Laidlaw Holdings, Inc., 27 F.3d 808, 814-15 (2d Cir. 1994) (holding that false promises that investments are guaranteed and secured do not provide risk-mitigation sufficient to avoid application of the securities laws).  Aside from Kabra's statements, no protective architecture existed for the noteholders.

Accordingly, the lack of any risk-mitigation factors weighs in favor of classifying the notes as securities.

### 5. Conclusion

The motivations, intentions and expectations of the defendants, the investors and the investing public, as well as the characteristics of the notes themselves demonstrate that the SEC has sufficiently alleged, pursuant to the Reves factors, that the notes qualify as securities. Consequently, defendants' motion to dismiss will be denied.

### ORDER

For the forgoing reasons, the motion of defendants to dismiss (Docket No. 36) is **DENIED**.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated April 1, 2020